UNITED STATES *v.* SHALLUS (No. 1716).[1]

1. EVIDENCE, WEIGHT OF—PRESUMPTION.

Where the evidence consisted of the testimony of 11 competent and credible witnesses, 6 for the importer and 5 for the Government, all of the importer's witnesses being in substantial agreement with each other and 4 of the Government's being at variance with each other as to the considerations upon which they based their testimony, this court would not be justified in saying that the Board of United States General Appraisers erred in holding that the importer had established his claim by a preponderance of the evidence.

2. EVIDENCE, PRESUMPTION—COLLECTOR'S ACTION PRESUMPTIVELY CORRECT.

Where an invoice, required by the Treasury Department's regulation pursuant to paragraph 656, tariff act of 1913, to be certified before the American consul, consisted of two sheets seeming in themselves to be parts of the same document, and had the certificate on the first sheet only, the certificate attaches presumably to both sheets as one document. Having been so accepted and passed on without objection by the collector in the line of his official duty, this court must presume, in the absence of proof to the contrary, that the form it had when filed with him was the form it had when submitted to the consul.

## United States Court of Customs Appeals, December 2, 1916.

APPEAL from Board of United States General Appraisers, Abstract 39392.

[Affirmed.]

*Bert Hanson*, Assistant Attorney General (*Charles D. Lawrence*, special attorney, of counsel), for the United States.

*Charles E. McNabb* for appellee.

[Oral argument October 11, 1916, by Mr. Lawrence and Mr. McNabb.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

Four cabinets, one bureau, one writing table, four side tables, five tables, one sideboard, one dining-room table, one small chair, two chairs, two armchairs, one dressing chest, three dressers, two commodes, two buffets, and two screens, imported at the port of Baltimore, were assessed for duty by the collector of customs under various paragraphs of the tariff act of 1913. The importer protested that the goods were artistic antiquities more than 100 years old, and that they were therefore free of duty under that part of the free list of said act which, in so far as it is pertinent, reads as follows:

### Free list.

That on and after the day following the passage of this act, * * * the articles mentioned in the following paragraphs shall, when imported into the United States * * * be exempt from duty: * * *

656. Works of art, * * * artistic antiquities, * * * which shall have been produced more than one hundred years prior to the date of importation, but the free importation of such objects shall be subject to such regulations as to proof of antiquity as the Secretary of the Treasury may prescribe.

---

[1] Reported in T. D. 36873 (31 Treas. Dec., 559).

The Board of General Appraisers sustained the protest as to the articles above described, and the Government appealed.

The board's decision was made by General Appraisers Waite and Brown on testimony submitted at Baltimore by the Government and the importer. Some of the testimony was taken by General Appraiser Hay and the rest of it by General Appraiser Sullivan. Neither of the appraisers before whom the witnesses for the Government and the importer appeared took part in the decision, and because of that the Government argues in effect that this court should review the testimony and come to its own conclusion as to the weight of the evidence without regard to the findings of fact made by the board. Whether or not the usual rule applicable to conflicting evidence should be applied in this case it is not necessary for us to decide, inasmuch as the review of the testimony which follows satisfies us that the board reached a conclusion which was supported by the weight of the evidence.

In support of the protest six witnesses testified that the merchandise was antique furniture more than 100 years old and based their opinion on the style of the furniture, the manner of putting it together, the wood of which it was composed, the color, and the evidences of wear. Five of these witnesses were dealers in antique furniture and one of them was a manufacturer of furniture, who was very frequently called upon to make over or repair old furniture. The Government on its part called five witnesses, two of them, Thomas and MacMullen, being customs examiners of furniture, with expert knowledge of antique furniture, and three of them, Vernay, Middlekoop, and Lenygon, being dealers in antique furniture.

As to 17 of the items in issue, there is no testimony on the part of the Government save that of Examiners Thomas and MacMullen. Thomas testified that item 931 was a bureau which was made up by taking apart an old William and Mary piece, and that the upper portion and the backing of the bureau were new; that item 939 was a cabinet to which had been added new legs and a modern decoration; that the carcass of item 956, a buffet, was old, but carried a modern molding; that a new molding had been applied to the dresser invoiced as item 962; that the carcass of item 980, a cabinet, was old. but that it had a new decoration and a new floor made of modern wood; that item 983 was a commode, the painting and gilding of which were modern and the legs of which were of white wood having modern decoration; that item 990 was a cabinet, made up, in his opinion, of old furniture, and that to it had been added new carving, new inlay, and a floor not 100 years old; that item 935, a dressing chest, was, in his opinion, a modern piece; that item 944, a writing table, was made of modern mahogany; that item 950, two chairs, and item 961, a buffet, were of modern oak and bore modern carving; that

the leather, wood, and paintings of item 968, a screen, and the paintings, wood, and carving of item 973, another screen, were modern; that item 992, a table, was made of modern oak and that the inlay on it was modern; that item 953 was a modern reproduction of an Elizabethan table, one of the legs of which was scratched and showed new wood; that item 960 was a made-up table with modern carving; that item 975 was a table, the legs of which ran only to the apron instead of to the top, a feature which, in his opinion, was not characteristic of furniture of the period which the table was supposed to represent. Out of the 17 items covered by this testimony, 5 of them, represented by numbers 961, 931, 968, 973, and 983, were sent to New York for further inspection, and as to them Examiner MacMullen testified that all were recent reproductions and that no portion of any of them was over 100 years old. That these items at the time of importation were not antiques more than 100 years old is therefore supported as to 12 of them by only one Government witness and as to 5 of them by only two Government witnesses. In view of the fact that six witnesses for the importer testified positively that all 17 items represented furniture more than 100 years old, we can hardly say that the contention of the importer as to those items was not sustained by a preponderance of evidence.

As to items 911, 929, 947, 963, 978, 987, 988, 989, 942, 972, 976, and 909, five Government witnesses testified. Examiner Thomas said that item 911 was a cabinet of *old* and *modern* oak, with modern carving. Examiner MacMullen said that the piece was *entirely modern*. Vernay said that it was an oak buffet, presumably of the Elizabethan period, and that it was made out of *old wood*, but that carvings and *moldings* were new; that it was entirely new work *with the exception of the doors and possibly the back*. Middlekoop said that it was a newly constructed cabinet and that it was made of *old wood* which had been carved over. Lenygon declared that the article was an oak buffet, *the large or body portion of which might be old*, but that the lower part of it was quite new.

Thomas said that item 929 was a side table, with modern carving. Vernay declared that the piece was a William and Mary table of walnut, the *carcass of which was old*, reveneered, and to which had been added a *new top, new legs*, and a *stretcher*. Middlekoop stated that the article was an *old William and Mary* table which had been *repaired and reveneered*. Lenygon held that the article was a walnut table inlaid with various woods, and that the piece was *entirely modern*.

Thomas was of the opinion that item 947 was a table with *four new legs* and that the *carving* on it was modern. Vernay said it was an oak table made out of *old wood*, somewhat correct in design, but was an *entirely modern piece* and lacking in antiquity. Middlekoop

declared that the table was a *new one*. Lenygon testified that the article was an oak table, quite new. He said that the *underside* of the top showed that the table had never been handled or moved about in any way and showed no signs of friction, but why he expected to find any particular evidences of friction on that part of the table rather than on the top was not explained. He also said that the *wood* of the table as it stood could not have been exposed to the air very long, and from that we infer that he was of the opinion that the wood was modern.

Thomas declared that item 963 was a dresser composed of a *new carcass* with new moldings, and in this he was corroborated by Mac-Mullen. Vernay said that the *body or base of the dresser was produced more than one hundred years ago;* that it was originally a plain piece of furniture, to which had been added moldings, half-split turnings, and new handles, which gave it the character of a work of art. Middlekoop held that the article was an *old Flemish kitchen piece*, to which had been added new moldings, new carvings, and cherry wood handles. He added that the piece itself was more than one hundred years old, but that the alterations increasing its value had been made later. Lenygon held that the dresser was an *old plain piece of furniture* to which had been added new carvings and moldings, thereby rendering the whole thing a new piece.

Thomas testified that item 978 was a dresser, the *inlay* and *drawer linings* of which were new. Vernay held that the article was a William and Mary dresser, the *body part of which was made out of an old oak dresser, veneered over and inlaid on the top*. He. said that the *drawer and stretcher were new*. Middlekoop said that the *framework of the article was old*, but that it had been *reveneered and that new legs had been added*. Lenygon described the article as a long dresser of inlaid walnut, and said that the piece was *quite new, not old at all*.

Thomas stated that item 987 was a sideboard not 100 years old; that item 988 was a dining-room table made up of an old nest of tables and part of a side table, to which had been added new framework and new decoration; that item 989 was a sideboard made up partly of an old carcass and that the inlay on the piece was new. Examiner MacMullen stated that item 988 was entirely modern. Vernay said that all three articles *were of the latter part of the eighteenth century or the beginning of the nineteenth*, but that they had been *reinlaid and trimmed up*, which spoiled them from the standpoint of the collector. Middlekoop declared that the three pieces were a Georgian set and were all *new work made of old boards* which had been inlaid later than the rest of the work. Lenygon inclined to the view that the set was mahogany furniture made during the last quarter of the eighteenth century, to which *some* new inlaid parts had been added and incorrectly inserted on the edge of each piece of furniture.

Thomas testified that item 942 was a commode and a modern piece of *new material* and *new design.* Vernay said that it was an Adam satinwood cabinet, with an *old carcass* reveneered and bearing entirely new decorations. He said that the style on the old top part had not been carried out and that the execution was wholly wrong. Middlekoop held that it was a commode which was *entirely new.* Lenygon declared that it was a satinwood cabinet on a stand; that the table was quite new, of new wood, and bore new veneering, new painting, and new gilding.

Thomas testified that two side tables, covered by item 972, were composed of modern mahogany, and two armchairs bearing the invoice number 976 were made of modern walnut. The testimony of Thomas as to these pieces was confirmed by Vernay, Middlekoop, and Lenygon. MacMullen said that item 976 was entirely modern.

Thomas testified that item 909 was a small chair, the design of which was one for which he could find no authority. He said the piece was not over 100 years old. Vernay described the chair as one having two square legs in the back, two bulbous legs in the front, and stated that although it may have existed, he had never heard of or seen such a thing before. Middlekoop declared positively that the chair had not been made more than 100 years ago. Lenygon described the chair as one covered with leather and having two heavily carved legs in the front. He said that the chair *might have been an original chair* with two front legs added, but as the two front legs were the feature of the chair, and were not old, he considered further inspection of the chair useless for the purposes of determining its antiquity.

As to all of the items which we are now discussing, save items 972 and 976, the Government witnesses, with the exception of MacMullen, gave in detail the physical characteristics upon which they based the opinion that none of the items could be regarded as antique furniture. These witnesses, however, although actuated by the best of good faith, were markedly at variance as to those characteristics of the furniture which all of them regarded as important in determining its antiquity, and that fact of course detracts from the weight which might otherwise be accorded to their testimony. On the other hand, the six witnesses of the importer, who were, we think, fully as well qualified to speak on the subject as the witnesses for the Government, and who were governed by substantially the same rules in determining the antiquity of the furniture, were a unit in saying that the several pieces were antiques more than 100 years old. With that as the state of the case, we do not think the court would be justified in saying that the board erred in holding that the importer had established his claim by a preponderance of evidence.

Paragraph 656, under which it is claimed that the goods in controversy were entitled to free entry, provides that free importation of such objects shall be subject to such regulations as to proof of antiquity as the Secretary of the Treasury may prescribe. In accordance with that provision, the Secretary of the Treasury required that there should be attached to the invoice a certificate of the foreign seller or shipper, certified before the American consul at the place of shipment, declaring when and where the articles claimed to be antiquities were produced and from whom and when they were purchased. The Government contends that the certificate filed by the importer with the invoice refers to none of the items here in controversy, except items 931, 980, 944, 972, and 987. This contention is based upon the fact that none of the other item numbers appear on the sheet which contains the certificate of the consul general, but are set out on a separate sheet attached thereto. Both sheets are signed by the seller, S. E. de Haas, and without doubt the certificate of the seller embraces all the articles involved and certifies not only the place where and the time when produced, but also the time when and the person from whom purchased. The only question, therefore, that can arise with reference to the certificate is whether the second sheet was submitted to the consul with the first sheet. It is urged that presumptively it was not so submitted, because the consular certificate is attached to the first and not to the second sheet, but that fact can not be regarded as raising a presumption against the verity of the document if the document itself discloses that the certificate was probably placed where it was for a reason consistent with good faith and with the authenticity of the paper. Such a reason, we think, is found in the fact that the first sheet is a printed form which has space for 11 items only and for the printed consular certificate. Evidently the 64 items covered by the invoice could not all appear on the first sheet, and it was quite natural that the seller, presumably a merchant, should attach another sheet, upon which he entered the 53 items for which there was no room on the first sheet, and equally natural that the consul should avail himself of the printed form on the first sheet rather than go to the trouble of writing out a consular certificate on the second sheet. Moreover, the fact that the column headings of both sheets are the same; that the items on both sheets are apparently written on the same typewriter with the same ink; that there is a reference in the certificate to the consular invoice by number, which invoice covers all the articles on both sheets; that one of the four pieces invoiced as a " complete suite " is entered as the last item on the first sheet of the certificate and the other three items as the first three items on the second sheet warrants, at least *prima facie*, the presumption that both sheets formed parts of the same document. But, however that may be, both

sheets were presented to the collector attached together as one document. He accepted both sheets without question as parts of the same certificate, and evidently considered that the Treasury regulations had been complied with as to all goods mentioned therein, because he passed upon the claim that the articles were antiquities. If the document itself raised a doubt as to its authenticity, it was the duty of the collector to satisfy himself that it was what it purported to be before accepting it as genuine. Presumably he did his duty in that behalf and did satisfy himself that the paper, after it had left the hands of the consul, had not been tampered with or altered or changed in any material particular. But, whether he did or not, the fact remains that, in the line of his official duty, he accepted the certificate as genuine; and in the absence of proof to the contrary we must presume that the form it had when filed with him was the form it had when submitted to the consul.

The decision of the Board of General Appraisers is *affirmed*.